Filed 6/6/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re | No. B286056 |
| RONALD E. JENSON, | (Super. Ct. No. BH011167) |
| on | |
| Habeas Corpus. | |

Petition for writ of habeas corpus.  Relief granted.

Marilee Marshall, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Julie A. Malone, Jill Vander Borght, and Jennifer O. Cano, Deputy Attorneys General, for Respondent.

———————————

In 1979, when Ronald Jenson was 19 years old, he committed first degree felony murder, for which he was convicted and sentenced to 25 years to life, plus two years.  During his first nine years of incarceration, Jenson committed three additional in-prison crimes, for which he was convicted and sentenced.  But, for the last almost 30 years, he has remained crime-free.

In 2016, the Board of Parole Hearings (the Board) found Jenson suitable for release on parole at a youth offender parole hearing conducted under Penal Code[1] section 3051. However, the California Department of Corrections and Rehabilitation (CDCR) did not release Jenson, and instead ordered him to serve an additional sentence for his in-prison offenses.

Jenson has petitioned this court for a writ of habeas corpus, urging that he is being illegally held. We agree, and thus we order his release.

## BACKGROUND

A.    *Jenson's Felony Murder Conviction and Subsequent In-Prison Felonies*

In 1979, when Jenson was 19 years old, he committed first degree felony murder, for which he was convicted and sentenced to 25 years to life, plus two years for firearm use. (§§ 187, subd. (a), 12022.5, subd. (a).)[2]

While he was incarcerated, Jenson was convicted of three in-prison felonies: prison escape and possession of a weapon, in 1980 when Jenson was 21 years old (§§ 4530, 4502); and assault with a deadly weapon on a peace officer, in 1989 when he was 29 years old (§ 245, subd. (b)). Pursuant to section 1170.1, subdivision (c) (hereafter, section 1170.1(c)), Jenson was sentenced to three additional consecutive prison terms, known as

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    The jury also found Jenson guilty of two counts of attempted robbery and found true firearm enhancements. The court imposed but stayed sentences on those counts.

"*Thompson* terms,"[3] for the in-prison offenses: sixteen months for the escape, one year for the weapon possession, and five years for the assault with a deadly weapon.

Jenson is now 58 years old. He has not committed a crime since 1989, and he has not been disciplined for a "serious rule violation" in more than 17 years.[4]

B.    *Youth Offender Parole Hearing; Grant of Parole*

Jenson became eligible for parole in 1997. He was denied parole four times between 1997 and 2014. At his fifth hearing in 2014,[5] the Board recommended parole, but the Governor reversed the Board's decision.[6]

---

[3]    *In re Thompson* (1985) 172 Cal.App.3d 256, 260, held that when a court imposes consecutive terms for felonies committed while a felon is confined in a state prison, "such terms shall commence from the time such person would otherwise have been released from prison."

[4]    Jenson did receive "counseling chronos" in 2007 (for ignoring an order to "return to the single line"); 2009 (for refusing to answer a supervisor's question); and 2010 (for failing to show identification in the chow hall).

[5]    The 2014 parole hearing does not appear to have been held under section 3051 or to have considered the factors in that section.

[6]    A decision of the Board finding an inmate suitable for parole becomes final as to the Board within 120 days of the date of the hearing. (§ 3041, subd. (b).) The Governor then has 30 days to reverse or to modify the Board's parole decision. (§ 3041.2, subds. (a), (b).)

In 2013, the Legislature passed Senate Bill No. 260, which, among other things, added section 3051 to the Penal Code. Section 3051 entitles certain prisoners who committed "controlling offenses" under the specified age of eligibility to youth offender parole hearings and to a "meaningful opportunity for release."

In 2016, the Board conducted a youth offender parole hearing and once again found Jenson suitable for release. In announcing its suitability determination, the Board noted several factors that weighed against suitability, namely that Jenson had committed "an atrocious and cruel act" that "resulted in the death of a human being;" had been convicted of three additional in-prison offenses; had "amassed some 48 115s [CDCR disciplinary reports]," some of which were "serious and violent, stabbing people, spitting on staff, fighting with inmates, attempting to stab staff, possession of weapons;" and had never admitted participating in the commitment offense.[7] Notwithstanding these factors, the Board found Jenson suitable for parole: "[W]e know . . . those are things now in the rearview, and in a distant rearview for you. Given that you've been

---

[7] As the dissent notes, at the 2016 parole hearing, Jenson denied committing the 1979 murder. Jenson admitted, however, that he stabbed and "almost killed" an officer in 1989. It was the realization that he could have taken a life that caused him to begin addressing his anger. Moreover, Jenson readily admitted that he had committed a variety of crimes before his 1980 conviction, and that had he not been incarcerated, he "most likely . . . would have continued" to "commit crimes." Accordingly, the Board noted that while Jenson had "denied the [commitment crime,] which [was his] right to do," he had admitted his "antisocial and tumultuous social history," including a lengthy juvenile record, and had not "minimize[d] [his] criminality in the past."

4

incarcerated 37 years and stayed violation-free for now some 17 years, that's a chunk of time that you've distanced yourself from that other human being—[¶] . . . [¶]—that you were. And it was in fact, a different human being[,] because we see an individual that is soft-spoken, insightful, reflective here today. . . . You were a mere 19 years old when you committed this life crime. A lot of the factors of [Senate Bill No. 260] are applied here . . . [including] your childhood of being [in] foster care and molestations, not believing or not trusting adults, leading to the way your thought process worked back then. So, and now you're almost to the age of elderly parole, that's how much time you served in prison. So the age in and of itself does reduce the recidivism rates. But I think more to do with that is how you changed your mannerisms, how you changed your philosophy and life since the time in . . . [1989], where you reflected that act almost took another human being's life. Since your incarceration, you have in the last about 20 years let's say, have had positive work assignments, positive performance ratings . . . . You received your GED in 2000, vocational training in graphic arts and janitorial. You have been involved in numerous self-help and self-study programs . . . [and] you were able to verbalize and demonstrate why you did what you did, what changes you have made throughout the years, and what tools you have garnered to safeguard against repeating those past mistakes." Thus, the Board found Jenson no longer posed a risk of danger to society and was suitable for parole.

C.    *Jenson's Continued Incarceration*

Despite the Board's suitability finding, the CDCR did not release Jenson, but instead required him to serve his *Thompson* term.[8]  The CDCR has calculated that his earliest possible release date is December 11, 2018, and his maximum release date is September 9, 2021.

Jenson sought a writ of habeas corpus from the superior court, which found that section 1170.1(c) mandated he serve his *Thompson* term for the 1989 assault.  Jenson filed a petition for writ of habeas corpus in this court, and we issued an order to show cause.

## CONTENTIONS

The dispute over Jenson's release date implicates two different provisions of the Penal Code:  (1) section 1170.1(c), which governs sentences for in-prison felonies; and (2) section 3051, which gives individuals sentenced for certain crimes committed under the age of 26 a "meaningful opportunity for release" from prison after serving 15, 20, or 25 years.

Jenson contends that the two statutory provisions are fundamentally inconsistent as they apply to him.  He therefore urges that section 3051—as the later-enacted and more specific statute—necessarily supersedes section 1170.1(c).  The Attorney General disagrees, contending that the two statutes are not fundamentally inconsistent, and so both must be given effect.

---

[8]    According to the Attorney General, Jenson's remaining term has been recalculated to reflect only the five-year *Thompson* term for the in-custody offense committed in 1989.

6

As we now discuss, we conclude that sections 3051 and 1170.1(c) are irreconcilable as they apply to a youth offender who commits an additional crime in prison after the age of 26, because section 3051, which specifically addresses youth offenders, dictates that the youth offender be immediately released upon being found suitable for parole.  In contrast, section 1170.1(c) would require the same youth offender to serve any applicable *Thompson* term even after being found suitable for release.  Because section 3051 is both later-enacted and more specific, we conclude that section 3051 supersedes section 1170.1(c).  Therefore, Jenson need not serve his *Thompson* term and is entitled to be released from prison.

## I.

## Principles of Statutory Interpretation and Standard of Review

We begin by outlining the principles that govern our review.  "We review questions of statutory construction de novo.  Our primary task 'in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose.  [Citation.]  We consider first the words of a statute, as the most reliable indicator of legislative intent.  [Citation.]'  [Citation.]  We construe the statute's words in context, harmonizing statutory provisions to avoid absurd results.  [Citation.]  If the statutory text is susceptible to more than one reasonable construction, we may consider extrinsic aids such as legislative history to facilitate our interpretative analysis."  (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.)

Wherever reasonably possible, a court must " ' "harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions." ' " (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 955.) " ' " 'Accordingly, they "must be read together and so construed as to give effect, when possible, to all the provisions thereof." ' " ' " (*Ibid*.) However, "the requirement that courts harmonize potentially inconsistent statutes when possible is not a license to redraft the statutes to strike a compromise that the Legislature did not reach." (*Id*. at p. 956.) Thus, if the statutory language compels the conclusion that the statutes are in conflict, "one must be interpreted as providing an exception to the other." (*Ibid*.) "The rules we must apply when faced with two irreconcilable statutes are well established. 'If conflicting statutes cannot be reconciled, later enactments supersede earlier ones [citation], and more specific provisions take precedence over more general ones [citation].' (*Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 [99 Cal.Rptr.2d 792, 6 P.3d 713] (*Rumsey*).)" (*State Dept. of Public Health*, at p. 960; see also *People v. Adelmann* (2018) 4 Cal.5th 1071, 1079.)

With these principles in mind, we turn to the language of the statutes at issue.

## II.
## The Statutory Scheme

A.    *Section 1170.1*

Section 1170.1, enacted in 1976, governs consecutive terms of imprisonment. As is relevant here, subdivision (c) provides that when a prisoner is sentenced to a consecutive term for a felony committed in state prison, "the term of imprisonment for all the convictions that the person is required to serve

8

consecutively shall commence from the time the person would otherwise have been released from prison." For prisoners serving indeterminate terms, the consecutive sentence for in-prison offenses begins on the date the prisoner is found suitable for parole, not the date he or she completes his base term. (*In re Coleman* (2015) 236 Cal.App.4th 1013, 1016–1022.)

B.     *Section 3051*

In a series of cases, our high courts have recognized that "children are constitutionally different from adults for purposes of sentencing" because of their diminished culpability and greater prospects for reform. (*Miller v. Alabama* (2012) 567 U.S. 460, 471 [132 S.Ct. 2455].) Hence, the Eighth Amendment's prohibition on cruel and unusual punishment has been held to prohibit imposition of the death penalty on juveniles (*Roper v. Simmons* (2005) 543 U.S. 551); life without possibility of parole (LWOP) on juveniles who commit nonhomicide offenses (*Graham v. Florida* (2010) 560 U.S. 48); mandatory LWOP on juveniles (*Miller*, *supra*, 567 U.S. 460); de facto LWOP on juvenile nonhomicide offenders (*People v. Caballero* (2012) 55 Cal.4th 262); and a sentence of 50 years to life for juvenile nonhomicide offenders (*People v. Contreras* (2018) 4 Cal.5th 349, 356).

In line with this evolution in how we think about and treat youth offenders, our Legislature enacted Senate Bill No. 260 in 2013 to implement the limitations on juvenile sentencing articulated in these cases. In adopting Senate Bill No. 260, which added section 3051 and amended sections 3041, 3046, and 4801, the Legislature explained that "youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of

9

society." (Stats. 2013, ch. 312, § 1.) Thus, the bill's purpose was "to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity." (*Ibid.*)

To this end, section 3051 provides that an offender who committed a "controlling offense" as a youth is entitled to a "youth offender parole hearing" after a fixed period of years set by statute. The "controlling offense" is "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

As originally enacted, section 3051 applied only to non-LWOP offenses committed before the offender was 18 years old. (Stats. 2013, ch. 312 (S.B. 260), § 4.) An amendment effective January 1, 2016 raised the age of eligibility to 23 years; and an amendment effective January 1, 2018 raised the age of eligibility to 25 years and included LWOP offenses committed before age 18. (Stats. 2015, ch. 471 (S.B. 261), § 1; Stats. 2017, ch. 675 (A.B. 1308), § 1; Stats. 2017, ch. 684 (S.B. 394), § 1.5.) Thus, section 3051 now provides that an offender who committed a "controlling offense" under the age of 26 is entitled to a "youth offender parole hearing" during his 15th year of incarceration if he received a determinate sentence; during his 20th year of incarceration if he received a life term of less than 25 years to life; and during his 25th year of incarceration if he received a term of 25 years to life. (§ 3051, subd. (b)(1)–(3).) An offender convicted of a controlling offense committed before the age of 18 for which he was sentenced to LWOP is entitled to a youth offender parole hearing during his 25th year of incarceration. (§ 3051, subd. (b)(4).)

The statute defines a youth offender parole hearing as "a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of" youth offenders. (§ 3051, subd. (a)(1).) At the hearing, the Board is required to afford the youth offender "a meaningful opportunity to obtain release," taking into consideration "the diminished culpability of youth as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." In an appropriate case, the Board "shall release the individual on parole as provided in Section 3041."[9] (§ 3051, subds. (d), (e), (f)(1).)

Section 3051 excludes several categories of youth offenders: offenders sentenced under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12); sex offenders sentenced under Jessica's Law (§ 667.61); offenders sentenced to LWOP for controlling offenses committed after age 18; and individuals to whom the section would otherwise apply, "but who, subsequent to attaining 26 years of age, commit[ ] an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison." (§ 3051, subd. (h).)

---

[9] Section 3041 concerns parole release dates. Subdivision (a)(4) of that section provides, "Upon a grant of parole, the inmate shall be released subject to all applicable review periods. However, an inmate shall not be released before reaching his or her minimum eligible parole date as set pursuant to Section 3046 unless the inmate is eligible for earlier release pursuant to his or her youth offender parole eligibility date."

11

In sum, section 3051 applies to someone who (1) commits a controlling offense when he or she is under the statutory age of eligibility, and (2) does not fall under one of the exclusions in subdivision (h).

C.    *Application of These Statutes to Jenson*

It is undisputed that Jenson was sentenced to a consecutive term for a felony committed while he was in state prison, within the meaning of section 1170.1(c).  It also is undisputed that Jenson committed his controlling offense when he was 19 years old and does not come within any of the exceptions to section 3051—that is, he is not a third striker or a sex offender, was not sentenced to LWOP, and did not after age 26 commit a malice aforethought or life crime.  (§ 3051, subd. (h).)  As such, he unquestionably was entitled to a youth offender parole hearing under section 3051 and was eligible for parole on his commitment offense.

The question before us, therefore, is whether having been granted parole, Jenson must serve his *Thompson* term before being released from prison, as directed by section 1170.1(c), or is entitled to immediate release from prison, as directed by section 3051.  We turn to that issue.

## III.

## Section 3051 Supersedes Section 1170.1
## With Regard to Youth Offenders Who Commit
## In-Prison Crimes As Adults

A.    In re Trejo

Only one published case, *In re Trejo* (2017) 10 Cal.App.5th 972 (*Trejo*), has considered the interaction between sections

1170.1(c) and 3051 as they apply to youth offenders who commit crimes in prison. In that case, defendant Trejo committed second degree murder at age 17, for which he was convicted and sentenced to a prison term of 15 years to life. At age 20, he committed an assault with a deadly weapon on a peace officer while incarcerated. He was sentenced to an additional term of four years, to be served consecutively to his life sentence. (*Id*. at pp. 975–976.)

After 35 years in prison, the Board found Trejo suitable for parole under section 3051. However, it determined that under section 1170.1(c), Trejo could not be released until he served his four-year *Thompson* term for the in-prison assault. (*Trejo*, *supra*, 10 Cal.App.5th at pp. 975–976.) Trejo filed a petition for writ of habeas corpus, challenging the legality of his continued confinement. The trial court denied the petition; Trejo then filed a petition with the Court of Appeal, which granted relief. (*Id*. at pp. 976, 991–992.)

In granting relief, the appellate court rejected the Attorney General's argument that section 3051 applies only to sentences imposed for crimes committed prior to incarceration, concluding that the text of the statute "indicates the opposite." The court explained: "Section 3051 provides for parole suitability review for inmates whose 'controlling offense' was committed before he or she was 23 years old.[10]  (§ 3051, subd. (a)(1).) As we have said, 'controlling offense' is defined as 'the offense or enhancement for which *any* sentencing court imposed the longest term of imprisonment.' (§ 3051, subd. (a)(2)(B), italics added.)  . . .  By

---

**10**    As noted, until January 1, 2018, section 3051 applied to offenders who committed their controlling offenses before age 23. As of January 1, 2018, the age of eligibility has been raised from 23 to 26.

13

referring to the longest term of imprisonment imposed by 'any' sentencing court, the Legislature indicated its intent that the controlling offense used to determine a youth offender's parole hearing date under section 3051 be selected from *all* sentences imposed upon that offender, regardless of whether they were imposed in one or a number of proceedings or cases.  'Any sentencing court' is open-ended:  Nothing in section 3051 suggests the only sentences to be considered are those imposed before the offender was incarcerated . . . ." (*Trejo*, *supra*, 10 Cal.App.5th at pp. 984–985.)

The court also agreed with Trejo that the Legislature's intent to exempt youth offenders from application of section 1170.1 is inherent in section 3051.  It explained that section 1170.1, subdivision (a), "requires that an inmate serve the requisite term for each consecutively sentenced offense and enhancement.  Under section 3051, subdivision (b)(1), however, a youth offender sentenced to a determinate term becomes eligible for release in the 15th year of incarceration even if he or she has not yet served the aggregate determinate term.  Where a youth offender is sentenced to a lengthy determinate term, then, section 3051 necessarily overrides the requirement of section 1170.1 that an inmate sentenced to consecutive terms not be released on parole before completing all the terms of imprisonment imposed.

"Similarly, section 3051 supersedes section 1170.1 when a youth offender is consecutively sentenced to a life term and a determinate term.  Section 1170.1, subdivision (a), incorporates section 669, which provides that when a person is sentenced to a life term and a consecutive determinate term, 'the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as

14

calculated pursuant to Section 3046 or pursuant to any other section of law that establishes a minimum period of confinement under the life sentence before eligibility for parole.'  Under section 3051, however, a person sentenced to a life term and a determinate term becomes eligible for parole after the time specified in section 3051, subdivision (b)(2) or (3), based on the life term, without regard to the determinate term.  [Citation.]

"We see no basis for inferring that the Legislature intended section 3051 to override the otherwise applicable provisions section 1170.1 as described above but to have no effect on the application of section 1170.1, subdivision (c)." (*Trejo, supra,* 10 Cal.App.5th at p. 986.)[11]

Finally, the court noted that Trejo had committed his controlling offense at age 17, and that none of the exceptions in section 3051, subdivision (h) applied to him because "[h]e was not sentenced pursuant to the Three Strikes law or section 667.61 or to a term of life in prison without possibility of parole, and his in-prison offense was committed *before* he reached 23 years of age [the then-operative age of eligibility] and neither involved malice aforethought nor resulted in a life sentence." (*Trejo, supra,* 10 Cal.App.5th at p. 982.)  The court thus concluded that Trejo was entitled to release when his parole became effective,

---

[11]     Indeed, our California Supreme agreed that section "3051 and 3046 have thus superseded the statutorily mandated sentences of inmates" who committed their controlling offenses before the age of 26. (*People v. Franklin* (2016) 63 Cal.4th 261, 278; see *Trejo, supra,* 10 Cal.App.5th at p. 989 ["Respondent maintains that the Board's consideration of suitability factors is insufficient because it is not 'the sentence contemplated by the sentencing courts, prosecutors, or the Penal Code.'  But this is true of all sentences affected by section 3051"].)

15

notwithstanding the consecutive four-year term imposed for the in-prison conviction.  (*Id*. at p. 989.)

B.    Trejo's *Reasoning Applies Equally to Youth Offenders Who Commit In-Prison Crimes As Adults*

Both parties appear to concede that *Trejo* is controlling law with regard to youth offenders who commit in-prison offenses under the age of 26.  We agree.  No published case has disagreed with *Trejo*'s holding, and although the Legislature amended section 3051 after *Trejo* was decided, it did not make any changes relevant to in-prison offenses.  Indeed, the only change the Legislature has made to section 3051 since *Trejo* was decided was to *broaden* the statute's reach by increasing the age of eligibility, not to narrow it.  We thus presume that the Legislature was aware of, and acquiesced in, the court's construction of the statute.  (See, e.g., *People v. Ledesma* (1997) 16 Cal.4th 90, 100–101 [" 'When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute.' "].)

The Attorney General contends, however, that *Trejo* should not govern the present case because its "holding relies on Legislative intent and policy supporting leniency for youthful offenders that should not extend to sentences for adult in-prison crimes."  Not so.  The Court of Appeal's analysis in *Trejo*, which we have discussed at length above, was grounded in the language of the relevant statutes.  And, while *Trejo*'s holding necessarily is limited to its facts, we discern nothing in the court's thoughtful statutory analysis that would not apply equally to defendants who commit in-prison crimes as adults.

16

C. *Sections 1170.1 and 3051 Cannot Be Harmonized With Regard to Youth Offenders Who Commit In-Prison Offenses As Adults*

Our conclusion that *Trejo*'s reasoning applies equally to the present facts is, without more, a sufficient basis for holding that Jenson need not serve his *Thompson* term. But there is another, equally convincing reason to reach this result—namely, that it is compelled by the language of section 3051, subdivision (h), which specifically addresses youth offenders who commit additional in-prison crimes *after age 26.*

Section 3051, subdivision (h) provides: "This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 26 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison." In enacting section 3051, therefore, the Legislature anticipated that some youth offenders would commit additional crimes after the age of 26,[12] and it specifically provided when such offenses will cause youth offenders to lose the opportunity for early release—i.e., if (1) malice aforethought is a necessary element of the crime, *or* (2) the crime is punished by life in prison.

---

[12]     As *Trejo* noted, such crimes necessarily will be committed in prison, since the earliest eligibility for parole under section 3051 is during the 15th year of incarceration, long after a youth offender will have reached age 26. (*Trejo, supra,* 10 Cal.App.5th at p. 985.)

17

Under the principle of "*expressio unius est exclusio alterius*," an express exclusion from the operation of a statute "indicates the Legislature intended no other exceptions are to be implied. (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr.377, 553 P.2d 37]; see also 2A Sutherland, Statutory Construction, *supra*, § 47.23, p. 123; 58 Cal.Jur.3d, *supra*, § 115.)" (*Strang v. Cabrol* (1984) 37 Cal.3d 720, 725.) As applied here, this principle suggests that the Legislature intended a youth offender who commits a crime in prison after age 26 to remain eligible for release from prison after serving 15, 20, or 25 years so long as the in-prison crime was *not* a "malice aforethought" crime and was *not* punishable by life in prison.

Section 3051, subdivision (h) thus is irreconcilably in conflict with section 1170.1(c) with regard to youth offenders who, after age 26, commit in-prison crimes for which malice aforethought is not a necessary element and which are not punishable by life in prison. As the present case illustrates, section 1170.1 would require such a person to serve an additional term for the in-prison crime after being paroled on the principal term. In contrast, section 3051 would require his or her immediate release upon a finding of parole suitability.

Sections 1170.1(c) and 3051 also result in entirely different parole hearing dates for some youth offenders who commit crimes in prison. Consider a hypothetical youth offender who, at the age of 18, commits a crime for which he is sentenced to five years in state prison. During his first year of his incarceration, he commits an additional crime and receives a consecutive sentence of 25 years to life. Because the in-prison crime is a *Thompson* offense, the two terms must be served consecutively under section 1170.1(c), and thus the prisoner will not become parole eligible

18

until he has been incarcerated for 30 years (5 years plus 25 years, without considering credits). Because the in-prison crime is also the controlling offense, however, under section 3051, the prisoner would be parole eligible during his 25th year of incarceration. (§ 3051, subd. (b)(3) ["A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions."].)

As we have said, where two statutes cannot be reconciled, " 'later enactments supersede earlier ones [citation], and more specific provisions take precedence over' the more general." (*People v. Adelmann*, *supra*, 4 Cal.5th at p. 1079.) Here, section 3051 was adopted in 2013 and specifically addresses parole eligibility for youth offenders. Section 1170.1 was adopted many decades earlier and generally concerns punishment for in-prison crimes, without distinguishing between youth and adult offenders. Because section 3051 thus is both later-enacted and more specific, it supersedes section 1170.1(c) with regard to youth offenders.

The dissent suggests there is no conflict between sections 1170.1(c) and 3051 because a defendant can be "paroled" on one crime but still be required to serve an additional sentence for another. But distinguishing between "parole" and "release" is contrary to the Legislature's express purpose in enacting section 3051—to give a youth offender "the opportunity *to obtain release* when he or she has shown that he or she has been rehabilitated

19

and gained maturity." (Stats. 2013, ch. 312, § 1, italics added.) The distinction also is contrary to the plain language of sections 3051 and 3041, which state that a youth offender parole hearing "shall provide for a meaningful opportunity t*o obtain release;*" the Board "shall *release*" an offender it determines eligible for parole; and on "a grant of parole, the inmate *shall be released.*" (§§ 3051, subds. (d), (e), 3041, subd. (a)(4), italics added.)

Nothing in section 3051 indicates "release" means release on just the controlling offense so that the prisoner can serve a *Thompson* term. Rather, "release" plainly means "release from incarceration." Interpreting "release" in this manner accords with the commonsense, plain meaning of the word. (See, e.g., Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 987 [release means "to set free from restraint, confinement, or servitude" or "relieve from something that confines, burdens, or oppresses"].) It also accords with the Legislature's stated intent in enacting Senate Bill No. 260—to give youth offenders a meaningful opportunity to obtain release *when* they reach rehabilitative benchmarks.[13]

For all of these reasons, we conclude that section 3051 supersedes section 1170.1(c) with regard to youth offenders who commit in-prison offenses as adults.

---

[13]    This phrase—meaningful opportunity to obtain release—has its genesis in *Graham v. Florida, supra*, 560 U.S. at page 75 and is unique to our youth offender statutory scheme, as it is not found in other parole-related statutes.

20

D.	*Our Interpretation of Section 3051 Does Not Give Youth Offenders a "Free Pass" to Commit Crimes in Prison*

Our interpretation of section 3051 does not give defendants a "free pass" to commit crimes in prison without consequence, as the dissent suggests. Because "serious misconduct in prison" is a parole suitability factor, parole will likely be denied or significantly delayed for a defendant who has committed an in-prison crime. (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(6) ["serious misconduct in prison" is a factor tending to indicate "unsuitability for release"].)[14] Adding an additional *Thompson* term to a defendant's sentence thus punishes a youth offender sentenced to an indeterminate term *twice* for in-prison offenses, because it can repeatedly delay a grant of parole and then add an additional prison term after parole is granted.

Consider Jenson's case. Jenson committed his controlling offense, which led to his incarceration, when he was 19, an age our Legislature has deemed of "diminished culpability." (§ 4801, subd. (c).) He was sentenced to 25 years to life for the murder, plus two years for the enhancement; for his in-prison offenses, he received an additional term of five years. By the time he was found suitable for parole in 2016, he had served in excess of 37 years—more than the mandatory determinate parts of his sentence—and had been denied parole five times, in large part because of "[his] record in prison," including "three [in-prison]

---

[14]	For this reason, the dissent's hypothetical inmate, who is convicted of a sexual assault 20 years into his prison term, cannot expect to be granted parole five years later at a youth offender parole hearing. (See also Cal. Code Regs., tit. 15, § 2402(c)(4) [commission of a sadistic sexual offense demonstrates unsuitability for parole].)

21

convictions" and "some 48 [disciplinary reports]."  In short, the Board (and the Governor) were well aware of Jenson's in-prison conduct, and explicitly took that conduct into account in granting him parole.  Requiring a youth offender like Jenson who has met the stringent benchmarks required for rehabilitation to remain incarcerated to serve a *Thompson* term turns section 3051 into a Pyrrhic victory:  Jenson is suitable for release having demonstrated maturity and rehabilitation, but he must remain in prison.

Moreover, no windfall results to Jenson and to similarly situated persons.  While the specific outcome in this case is Jenson's release on parole, the general implication of our decision is not a wholesale release of prisoners.  Our decision merely means that youth offenders who commit nonlife crimes or crimes for which malice aforethought is not an element while in prison after attaining the age of 26 are still entitled to a youth offender parole hearing and to a meaningful opportunity for release.  *A hearing* and *an opportunity*.  Nothing more.  At that hearing, the Board will evaluate the prisoner holistically—any *Thompson* crimes being part of the whole.  Such crimes may militate against a grant of parole.  (See also *Trejo*, *supra*, 10 Cal.App.5th at p. 988.)  Our decision thus does not encourage bad behavior in prison.  The youth offender who continues to commit crimes while incarcerated only sabotages the chance of a good outcome at his or her parole hearing.  A youth offender parole hearing offers a meaningful opportunity for release.  It is not a guarantee of one.

## DISPOSITION

Jenson is ordered released on parole. His release date shall be amended to be September 9, 2016, and the days of incarceration he has served since that day shall be deducted from his parole period. In the interests of justice, this opinion shall be deemed final immediately upon filing. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

**CERTIFIED FOR PUBLICATION**

DHANIDINA, J.*

I CONCUR:


EDMON, P. J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**EGERTON, J., Dissenting.**

I respectfully dissent. In my view, we can and should reconcile Penal Code section 1170.1, subdivision (c), with section 3051. The plain language of the statutes, read with the Legislature's purpose in enacting each in mind, leads to the conclusion that an inmate who is granted parole for a life crime committed when he was younger than 26 must still serve his consecutive term for a new and different offense committed in prison when he was no longer youthful by any definition.

1. ***Jenson's 1979 murder of L.C. Walker, his 1989 assault on an officer with a knife, and the 2016 parole hearing***

In 1979 a jury convicted petitioner Ronald Jenson of the first degree murder of L.C. Walker with a shotgun. The presiding commissioner at Jenson's April 2016 parole hearing summarized the facts of the crime: "A 64-year old male victim was fatally shot at a gas station. It was reported that he was visiting the gas station attendant who was sitting inside the gas station watching television. According to the attendant, four males entered the gas station with weapons in their possession. Mr. Jenson, who had a shotgun, pressed the weapon into the victim's side, and another suspect was holding a handgun nearby. The victims were told to sit down and not move. The victim who was killed had a revolver in his pocket, and told the suspects why don't you kids go on away from here. And his hand came out of his pocket with the handle of the gun visible, at which point the shotgun was fired striking the victim. . . . The victim died from his injuries." The trial court sentenced Jenson to life with a minimum eligible parole date of 27 years (25 years to life for the

1

first degree murder plus two years for his use of a firearm under the then-applicable version of Penal Code section 12022.5[15]).

While in prison, Jenson committed three more felonies. He committed two of those crimes—escape without force and manufacture or possession of a deadly weapon by an inmate—during his first year in prison. Jenson was 21 at the time. Then, in 1989, Jenson was charged with assault with a deadly weapon on a peace officer.[16] Jenson was 29 when he committed that offense. Jenson spoke about the crime at his April 2016 parole hearing. Jenson said the officer had used a racial slur in referring to Jenson's mother and his wife. The officer "told [Jenson] what he was going to do to them sexually." Jenson continued, "And unfortunately at that time, I lost my cool and I went and got a knife, and I stabbed him and he almost lost his life."

The Marin County District Attorney filed charges. On November 29, 1989, Jenson entered into a plea agreement with the People. Jenson pleaded guilty to the charge. The court sentenced him to the agreed-upon term of five years in the state prison, to be served consecutively to the life term. The People struck an enhancement on the assault with a deadly weapon count and dismissed a second count as part of the plea deal.

---

[15] Under current law, a perpetrator's intentional discharge of a firearm causing death or great bodily injury adds 25 years to a first degree murder sentence under Penal Code section 12022.53, subdivision (d).

[16] At the time, that crime constituted a violation of Penal Code section 245, subdivision (b). Now, section 245, subdivision (c), is the applicable provision for that crime.

In late 2014, the parole board granted Jenson parole. However, in March 2015, Governor Brown reversed the board's decision. The Governor described Jenson's murder of Walker as "senseless." The Governor continued, "Mr. Jenson's conduct in prison demonstrates an inability to control his temper and abide by the rules. He has been disciplined for serious misconduct 48 times and less serious misconduct 42 times. Ten of his serious disciplinary actions were for violent behavior including stabbing a correctional officer in the neck, attempting to stab staff, assaulting an inmate, stabbing an inmate, spitting in staff members' faces, fighting with another inmate, and possession of inmate-manufactured weapons." The Governor commended Jenson for his "efforts to improve himself during his 36 years of incarceration." However, in reversing the board's decision to parole Jenson, the Governor noted Jenson's "extensive criminal history and many violent acts while incarcerated." This court denied Jenson's petition for a writ of habeas corpus challenging the Governor's decision.

As noted, Jenson had another parole hearing on April 29, 2016. At the hearing, Jenson insisted he did not commit the 1979 murder of Walker. He had been, he said, falsely accused and wrongly convicted. Jenson stated a man named James Downey had fingered him for the crime because of a dispute over a woman. Jenson also said Walker's friend, eyewitness Walter Diggs, had not positively identified him and had been led by the prosecutor in his testimony at trial.[17] In addition, Jenson blamed his co-defendant for testifying against him.

---

[17] The board was unable to locate the court of appeal's decision affirming Jenson's conviction, so the commissioners asked Jenson if Diggs had identified him at trial.

At the 2016 parole hearing, the deputy district attorney representing the People asked the commissioners to question Jenson about custodial counseling chronological documentations (so-called CDC-128-A's) he received in 2007, 2009, and 2010 for disobeying direct orders of corrections personnel. The district attorney argued against parole for Jenson, stating, "[Jenson] has continued since he was a youth through the transition period into adulthood to violate rules in prison. He has an extremely, for a long time, bad record in prison. I would argue 2007, 2009, 2010 are a continuation."

2. ***Discussion***

Jenson's writ petition presents a question of statutory interpretation. In construing statutes, " 'our fundamental task is "to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." ' (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)" (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135; see also *Weidenfeller v. Star & Garter* (1991) 1 Cal.App.4th 1, 5 ["Our obligation is to interpret the statute 'to effectuate the purpose of the law.' ([ ] *Santa Barbara County Taxpayers Assn. v. County of Santa Barbara* (1987) 194 Cal.App.3d 674, 681 [239 Cal.Rptr. 769]."].) "[S]tatutes must be construed in a reasonable and common sense manner consistent with their apparent purpose and the legislative intent underlying them—one practical, rather than technical, and one promoting a wise policy rather than mischief or absurdity." (*Herbert Hawkins Realtors, Inc. v. Milheiser* (1983) 140 Cal.App.3d 334, 338.) "As always, we start with the language of the statute, 'giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' (*Pineda* [*v. Williams-Sonoma Stores,*

4

*Inc.* (2011)] 51 Cal.4th [524,] 529–530.)" (*Apple*, at p. 135.) " 'We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal. Rptr. 3d 676, 101 P.3d 563].)" (*In re Coleman* (2015) 236 Cal.App.4th 1013, 1018 (*Coleman*).)

Penal Code section 1170.1, subdivision (c)—enacted in 1976 and amended many times since—provides, "In the case of any person convicted of one or more felonies committed while the person is confined in the state prison . . . and the law either requires the terms to be served consecutively or the court imposes consecutive terms, the term of imprisonment for all the convictions that the person is required to serve consecutively shall commence from the time the person would otherwise have been released from prison." These consecutive terms commencing on what otherwise would have been the inmate's release date have come to be known as *Thompson* terms, after *In re Thompson* (1985) 172 Cal.App.3d 256. The reason the Legislature enacted

5

Penal Code section 1170.1, subdivision (c), is obvious and sound: to deter inmates from committing more crimes while in prison. "It is well established the Legislature intended that 'in-prison crimes . . . be punished more severely than crimes committed "on the outside." ' ([*People v.*] *White* [(1988)] 202 Cal.App.3d [862,] 869.)" (*Coleman, supra,* 236 Cal.App.4th at p. 1022.) "Commencing the consecutive sentence for the custodial offense on the date the prisoner otherwise actually would have been released on parole is consistent with the Legislature's intent to punish and deter criminality in prison." (*Ibid.*)

Penal Code section 3051—enacted in 2013 and amended several times since—grants a youth offender (now defined as an inmate who committed his controlling offense before he was 26 years old) a parole hearing after 15, 20, or 25 years, depending on the controlling offense. An inmate like Jenson, who was convicted of first degree murder committed when he was 19 years old, is entitled to a youth offender parole hearing after 25 years. (Pen. Code, § 3051, subd. (b)(3).) Subdivision (h) of the statute carves out three categories of inmates who are not entitled to receive a youth offender parole hearing: (1) inmates serving a third strike sentence; (2) inmates sentenced to life without the possibility of parole for crimes committed as adults; and (3) inmates who, at age 26 or older, commit an additional crime that requires malice aforethought or that results in another life sentence. (Pen. Code, § 3051, subd. (h).)

These two statutes can be reconciled. The carve-out provision in Penal Code section 3051, subdivision (h), denies the three categories of inmates listed there *any youth offender parole hearing at all.* By contrast, an inmate like Jenson, who committed a life crime while 25 or younger, *will* receive his youth

6

offender parole hearing after 25 years. The board may grant that inmate parole. But that grant does not mean that the inmate now does not have to serve his consecutive *Thompson* term for a crime committed when he was 26 or older.[18] Here, Jenson was nearly thirty years old when—according to his own account—he went and procured a knife (showing planning and not simply an impulsive act), and then stabbed an officer in the neck, nearly killing him. At that age, Jenson was fully an adult, and the Legislature's concerns for the "diminished culpability of juveniles as compared to adults," the "hallmark features of youth," and the recognition that "children are constitutionally different from adults for purposes of sentencing" (*In re Trejo*, at pp. 980−981, 987) no longer apply.

Consider this hypothetical: A 25-year-old man shoots and kills someone. A jury convicts him of first degree murder and finds the gun allegation true. The defendant also has a prior strike—let's say for robbery, when he was 24. The court sentences him to life with a minimum eligible parole date of 80 years (25 years to life for the first degree murder, doubled because of the strike prior, plus 25 years for the intentional discharge of the gun causing death, plus a five-year prior under Penal Code section 667, subdivision (a)). Twenty years later, at the age of 45, the inmate sexually assaults a fellow inmate, or a guard. He is convicted of that crime, his sentence to be served consecutively. The inmate nevertheless will receive a youth offender parole hearing 25 years after his commitment for the

---

[18] Under *In re Trejo* (2017) 10 Cal.App.5th 972, Jenson does not have to serve his *Thompson* terms for the felonies committed in prison when he was 21 years old.

7

murder. The board may grant him parole on his life case, effectively knocking 55 years off of his sentence. But the inmate still must serve his *Thompson* term for the sexual assault. Read this way, consistent with their plain language, Penal Code section 1170.1, subdivision (c), and section 3051 are not inconsistent. The inmate gets a hearing after 25 years, effectuating the Legislature's concern for youthful offenders, and the inmate still must serve his term for his in-prison crime committed as a fully grown adult, effectuating the Legislature's purpose of deterring prison inmates from committing more crimes while in custody.

Finally, Penal Code sections 3041 and 3046 do not change this analysis. Penal Code section 3046 generally addresses parole for defendants sentenced to life. Subdivision (c) provides that an inmate found suitable for parole after a youth offender parole hearing "shall be paroled regardless of the manner in which the board set release dates pursuant to subdivision (a) of Section 3041, subject to subdivision (b) of Section 3041 and Sections 3041.1 and 3041.2, as applicable." (Pen. Code, § 3046, subd. (c).) Penal Code section 3041 sets forth the workings of parole generally. Section 3041, subdivision (a)(4), states, "Upon a grant of parole, the inmate shall be released subject to all applicable review periods. However, an inmate shall not be released before reaching his or her minimum eligible parole date as set pursuant to Section 3046 unless the inmate is eligible for earlier release pursuant to his or her youth offender parole eligibility date . . . ." (Pen. Code, § 3041, subd. (a)(4).) Penal Code sections 3041.1 and 3041.2 have to do with the Governor's right to review parole decisions.

8

Neither Penal Code section 3041 nor section 3046 mentions section 1170.1(c).  Again, a grant of parole to an inmate like Jenson does not mean the inmate now is relieved of his obligation to serve his *Thompson* term for a crime committed when no longer a "youth."  Returning to the hypothetical inmate discussed above, these statutes work this way:  Under Penal Code section 3046, subdivision (c), the inmate may be paroled from his life sentence after 25 years, without having to wait for his previous minimum eligible parole date of 80 years.  But he is "paroled" to his *Thompson* term, in Department of Corrections terms.  By contrast, an inmate serving a life sentence for a crime committed when 25 or younger who does *not* commit any in-custody crime, and therefore owes no *Thompson* term, is released immediately under Penal Code section 3041, subdivision (a)(4); he does not have to serve his remaining time for—for example—his gun use causing the victim's death or for his prior strike.

In sum, in my view, the Legislature—in enacting Penal Code section 3051—cannot have meant to give inmates who committed their controlling offense at age 25 or younger a free pass for any and all future crimes committed in prison when they cannot be considered "youth" by any definition of the word, statutory or otherwise.  I do not believe our Legislature intended implicitly to repeal Penal Code section 1170.1, subdivision (c), or to change the law so that a youth offender who later, at nearly 30 years of age, attacks a guard with a knife, almost killing him, does not have to serve his *Thompson* term for that crime.  Construing the two statutes in this reasonable and common sense manner consistent with their apparent purpose and the legislative intent underlying them promotes the wise policies of both leniency toward youthful offenders and the protection of

9

inmates, guards, and other corrections staff from crimes committed in prison by fully grown men and women. Respectfully, this interpretation "comports most closely with the apparent intent of the Legislature, with a view toward promoting, rather than defeating, the general purpose of the statute[s] . . . ." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1313.)  I would deny Jenson's petition.


EGERTON, J.